UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MAYRA CASTILLO,

             Plaintiff,

    -against-

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

           Defendant.

---

**REPORT & RECOMMENDATION**

13CV5089 (AT)(MHD)

12/16/14

TO THE HONORABLE ANALISA TORRES, U.S.D.J.:

    Plaintiff Mayra Castillo filed this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g) ("the Act"), to challenge a final decision of the Social Security Administration ("SSA") denying her application for disability insurance benefits under the Act. Plaintiff and the Commissioner ("defendant") have cross-moved for judgment on the pleadings.

    For the reasons set forth below, we recommend that plaintiff's motion be granted in part, that defendant's motion be denied, and that the case be remanded for further administrative consideration.

1

**BACKGROUND**

I.  **Procedural History**

Ms. Castillo filed an application for disability insurance benefits ("DIB") on November 14, 2011, claiming that she had become disabled on December 1, 2010. (Admin. R. Tr. ("Tr.") 126). The Social Security Administration ("SSA") denied her application after initial review on January 4, 2012. (Id. at 74). Plaintiff subsequently requested a hearing to review the adverse determination. (Id. at 90).

A review hearing was held before Administrative Law Judge ("ALJ") Mark Solomon on June 22, 2012, and plaintiff was represented by counsel at that hearing. (Tr. 14). ALJ issued his decision denying plaintiff benefits on July 12, 2012. (Id. at 8-23). The Appeals Council denied plaintiff's request for review of the ALJ's decision on July 3, 2013, making the Commissioner's determination final. (Id. at 1).

Plaintiff had previously filed an application for DIB on January 31, 2011. (Tr. 14). The SSA denied her application on May

2

6, 2011, and that decision was made final based on administrative action and not subject to further review. (Id.).

## II.   The Pertinent Record

### A. Plaintiff's Testimony at the Hearing and Submissions

Ms. Castillo was born in 1960 in the Dominican Republic. (Tr. 44). Her formal education there ended at either the fifth or sixth grade, and she cannot speak English.[1] (Id.). She immigrated to the United States in 1994, and has been a lawful permanent resident since 2006. (Id. at 45, 130). Ms. Castillo is a divorced mother of four children, two of whom are adults, one of whom is deceased, and the youngest of whom was sixteen at the onset of her alleged disability. (Id. at 127, 236). Her teenage daughter was living with her at the time of the hearing before the ALJ. (Id. at 49).

Plaintiff testified that she had not worked since the onset of her disability in December 2010. (Tr. 46). Prior to that time she had worked at cleaning offices and stores for most of her professional life. (Id. at 47-48). She testified that she could

---

[1] The hearing before the ALJ on June 22, 2012 was conducted with the assistance of a Spanish-language interpreter. (Tr. 41).

not do that work anymore and had stopped working in that capacity sometime in the year prior to her disability onset. (Id. at 48). Prior to December 2010, plaintiff had worked as a home care attendant for roughly six or seven months, but terminated that position because "[w]ith my back, my pain, and my knees I couldn't deal with the patients." (Id. at 47). She also claimed that her arms hurt from arthritis. (Id.). Her "Work History Report" indicates that she worked for Secure Cleaners from 1998 to 2006, and as a Home Attendant in 2010. (Id. at 172). The SSA Disability Report indicates that plaintiff was self-employed as an office cleaner from the Spring of 1996 until the Winter of 2009. (Id. at 139). She reported working 6.5 hours per day for five days a week at $10.00 per hour as an office cleaner through the Winter of 2009, and then 5.5 hours daily for 3.5 days a week at $8.00 per hour as a home attendant in 2010. (Id.).

Plaintiff testified that her primary disabling conditions are her back pain and depression. (Tr. 51). She indicated that she had been undergoing therapy for her physical ailments in her back and leg for a year prior to the hearing. (Id. at 49). In her concluding statement she reiterated that she has "the pains because I have a deviation in my back. I have arthritis in the entire body." (Id. at 53). She testified that she could travel by herself by bus and

4

does not require an assistive device for walking. (Id.). Ms. Castillo also said that she had visited the Dominican Republic with her two daughters for eight days in December 2011. (Id. at 50).

At the time of the hearing, Ms. Castillo lived with her 18-year-old daughter. (Tr. 49). Ms. Castillo testified that she was able to bathe and shower by herself, as well as fix her hair and put on jewelry. (Id. at 49-50). However, she spent most of the day lying down, watching television and reading the Bible. (Id. at 50). She explained that her back hurts when she has been sitting, so that she has to move around or lie down; she can only sit normally for 20 to 30 minutes at a time. (Id.).

Regarding her psychiatric condition, plaintiff testified that she had been seen by a psychiatrist for one year at the time of her hearing. (Tr. 48). She reported that she experiences dizziness and drowsiness from the prescriptions for her depression. (Id. at 51). She also testified that she is "always crying. I tell [my psychiatrist] about my, so many problems. I don't feel like doing anything. I spend three or four days. I don't even want to bathe myself to go out anything." (Id. at 52). She cried during this portion of her testimony and explained that it was "[b]ecause I

5

see what my life turned into." (Id.). She is unable to watch a television show in Spanish from start to finish: "I get lost thinking about things and like that." (Id. at 51-52).

## B. Medical Records:  Treating  Physicians  and  Mental  Health Professionals

### 1. Dr. Elsa J. Reyes

The record includes a "Physician's Report for Claim of Disability" submitted by Dr. Elsa J. Reyes on June 12, 2012. Dr. Reyes reported treating plaintiff every three to four months from April of 2003 through the date of her report. (Tr. 272-77). No treatment notes from Dr. Reyes were included in the administrative record. No specialization is indicated for Dr. Reyes, but internet research confirms that Dr. Reyes practices internal medicine with Hispaniola Medical Care, P.C. in New York City.[2]

Dr. Reyes reported that plaintiff's symptoms were low back pain and back pain with clinical findings of minimal

---

[2] "Physician Director," WebMD, Dr. Elsa J. Reyes, M.D., http://doctor.webmd.com/doctor/elsa-reyes-md-e2dcc049-92a3-de11-9b4f-001f29e3bb62-overview (last visited Nov. 19, 2014).

dextroscoliosis,[3] moderate to severe levoscoliosis,[4] small osteophytes[5] at the L4-5 levels and mild medial compartmental narrowing of the left knee. (Id. at 273). Dr. Reyes relied on a thoracic x-ray and a lumbar x-ray to support these diagnoses. (Id.). Her prognosis for Ms. Castillo's condition was guarded. (Id.). She indicated that these physical conditions did not require Ms. Castillo to lie down during the day. (Id.). Dr. Reyes confirmed that plaintiff had received physical therapy and an orthopedic consult. (Id. at 274). During treatment, Dr. Reyes had prescribed Voltaren gel, 200mg of Celebrex, 500mg of Tylenol, 15mg of Mobic, and 10mg of Flexeril, noting that the Celebrex and pain medications were indicated for the levoscoliosis and the osteoarthritis. (Id.).

Dr. Reyes evaluated plaintiff's functional capacities. She estimated that Ms. Castillo was able to sit for one to two hours and stand or walk for thirty minutes during an entire eight-hour

---

[3] "Dextro" refers to the right. 1 Attorneys Medical Deskbook § 5:6. "Scoliosis" is an abnormal side-to-side spinal curvature often caused by muscle and bone deformities or unequal muscle contraction. 1 Attorneys Medical Advisor § 15:31

[4] "Levo" is the opposite of "dextro" and indicates the left side. Dorland's Illustrated Medical Dictionary 923 (1994).

[5] Osteophytes, are bony nodules growing around joints that deform the joints, are the clinical findings associated with osteoarthritis. 2 Attorneys Medical Deskbook § 24:19.

workday. (Tr. 274).  Plaintiff would be able to lift and/or carry a maximum of 20 pounds and occasionally perform a variety of activities, including bending, squatting, crawling, climbing, and reaching. (Id. at 275). Plaintiff could not use her hands for repetitive actions, such as simple grasping, pushing and pulling of arm controls, and fine manipulations. (Id. at 276). She indicated mild restrictions for activities involving heights, being around moving machinery, and driving a car, along with moderate restrictions for exposure to marked changes in temperature and humidity and exposure to dust, fumes, and gases. (Id.) Dr. Reyes also noted plaintiff's ability to travel alone on a daily basis by bus and/or subway. (Id. at 277).

### 2. Emma L. Bowen Community Service Center (also known as Upper Manhattan Mental Health Center, Inc.)

Treatment notes from the Emma Bowen Community Service Center, also known as the Upper Manhattan Mental Health Center, Inc., document the psychiatric care and clinical psychology treatment plaintiff received at that clinic between April 11, 2011 and February 26, 2012. (Tr. 236-69). The report of consulting psychologist Haruyo Fujiwaki (see discussion p. 18 infra) confirms that plaintiff reported seeing a psychiatrist monthly and a therapist weekly at the Upper Manhattan Mental Health Center for

8

the year prior to Dr. Fujiwaki's evaluation in December of 2011; however, the record lacks treatment notes to support such regular care during 2011. (See discussion p. 11 infra).

### a. Initial Psychiatric Examination

Dr. Y. Kury, a psychiatrist, conducted an initial psychiatric assessment of Ms. Castillo on April 11, 2011. (Tr. 236-41). Dr. Kury diagnosed plaintiff on Axis I with major depressive disorder, severe (DSM-IV 296.33),[6] post-traumatic stress disorder (DSM-IV 309.81) and a GAF score of 55.[7] Dr. Kury deferred her Axis II

_____

[6] The DSM-IV is the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition. It is a publication that lists assessment criteria for every mental disorder diagnosis. 1 Attorneys Medical Deskbook § 5:6. "The coding in the manual is used by psychiatrists, clinical psychologists, family therapists, psychiatric nurses, and all other mental health professionals. Health insurers and Medicare require this coding for reimbursement." 2 Attorneys Medical Deskbook § 25:51.10. Psychiatric diagnoses under the DSM-IV are structured along five axes. Axis I is the clinical coding of the specific psychiatric disorder; Axis II is any diagnosis of an underlying personality disorder; Axis III provides diagnosis of medical condition(s) affecting a mental disorder; Axis IV indicates the presence of any psychosocial or environmental problems affecting the care of the disorder; and Axis V is an assessment of overall functioning such as the GAF. 2 Attorneys Medical Deskbook § 25:51.10.

[7] GAF is the Global Assessment of Functioning Scale, from 1 to 100, by which a clinician rates a patient's ability to function. Plaintiff's score of 55 puts her in an equivocal status: above 80 is considered excellent functioning and 40 or below signifies dysfunction typical of hospitalized patents. 2 Attorneys Medical Deskbook § 18:10. A GAF score between 51 and 60 is indicative of "[m]oderate symptoms (e.g., flat affect and

diagnosis, and indicated back pain under Axis III. (Id. at 240).
Under Axis IV Dr. Kury listed the death of Ms. Castillo's son in
2007 and Ms. Castillo's having been abandoned by her mother at
birth as psychosocial factors affecting her condition. (Id.). Dr.
Kury referred Ms. Castillo for care through the adult outpatient
unit, including psychotherapy, and prescribed Lexapro[8] and
Buspirone[9] for depression and anxiety, as well as the sleep aid
Zolpidem.[10] (Id.).

Dr. Kury based her diagnosis on a patient history and clinical
evaluations addressing plaintiff's interview behavior,
perceptions, cognitive functions, impulse control, judgment, and
personality traits. (Tr. 236-40). Ms. Castillo's psychosocial
history included the death of her son from stomach cancer four

---

circumstantial speech, occasional panic attacks) [or] moderate
difficulty in social, occupational, or school functioning (e.g..
few friends, conflicts with peers or co-workers)." DSM-IV-TR 34.

[8] Lexapro is a brand name for escitalopram, is used to treat
anxiety and depressive disorders. Potential side effects include
agitation, dizziness, sedation, and seizures. 3 Attorneys
Medical Deskbook § 39:8.

[9] Buspirone, known by the brand name BuSpar, is an anti-
anxiety agent. Potential adverse reactions include anxiety,
dizziness, and headaches. 3 Attorneys Medical Deskbook § 39:8.

[10] Zolpidem, known by the brand name Ambien, is used to
treat insomnia. Potential side effects include anxiety,
dizziness, hallucinations, and memory loss. 3 Attorneys Medical
Deskbook § 39:8.

years earlier, concern over the impending death of her biological father from whom she had been estranged for much of her life, sexual abuse at the hands of cousins when she was six years old, and verbal abuse by an aunt who raised her when her mother died. (Id. at 236-37). Dr. Kury noted that plaintiff's appearance was appropriate and her thought process was coherent with no signs of delusions. (Id. at 238). Plaintiff was tearful during the session, and presented with fair memory, a ninth-grade level of education, and fair judgment. (Id. at 236-40).

### b. Psychotherapy Sessions

Following the initial intake with Dr. Kury, Ms. Castillo saw Lena Melendez, L.C.S.W. at the Emma L. Bowen Community Service Center on April 27, 2011 for a follow-up psychotherapy appointment. (Tr. 242-51). Notes from additional psychotherapy treatments at the same clinic indicate that Milagros Nunez, LCSW, treated plaintiff on January 3, 2012, January 11, 2012, February 1, 2012, and February 15, 2012. (Id. at 257-65). The records do not indicate whether Ms. Castillo received any treatment between the April 2011 appointment and January 2012.

During the April 27, 2011 visit, Ms. Melendez elaborated on the patient history, clarifying that Ms. Castillo had been raped

by a man in his 40s when she was six to seven years old. (Tr. 248).
She confirmed that plaintiff has a 6th grade education and
documented that she was staying at home, oversleeping, and binge
eating. (Id.). Ms. Melendez noted plaintiff's complaints that she
"hears voices calling her name . . . feels people are next to her."
(Id. at 249). Ms. Melendez also reported that plaintiff admitted
suicidal ideation but denied having made any attempts. (Id. at
245). The treatment notes list as strengths that plaintiff is
"domiciled, motivated for treatment, and has some insight into her
core issues." (Id. at 250). The notes list as weaknesses that she
is "isolated, [has] few social supports, [has suffered] losses,
[and has experienced] severe childhood sexual abuse." (Id.).
Social isolation, depression, and anxiety were identified as
patient's problems. (Id.).

The next psychotherapy appointment was on December 14, 2011,
when Ms. Nunez provided support to plaintiff for an upcoming trip
to the Dominican Republic. (Tr. 257). The treatment notes from
that session indicated that plaintiff was complying with her
medication and was not experiencing side effects. (Id.). Ms.
Castillo reported "feeling very nervous" and "suffering from fear
of flying," but explained that she was nonetheless making the trip
to visit her son's grave for the first time and to spend time with

12

her grandson from that deceased son. (Id.). Ms. Nunez addressed with plaintiff relaxation exercises and therapy for feelings related to death. (Id.).

A follow-up session on January 3, 2012 centered on plaintiff's depression and anxiety, as well as her concern about her biological father's severe illness. (Tr. 258). The therapy focused on plaintiff's early childhood abandonment. (Id.). A session one week later continued to focus on patient's depression and anxiety, which had been heightened by her father's terminal illness. (Id. at 260). Plaintiff failed to show for an appointment on January 26, 2012. (Id. at 261). On February 1, 2012, Ms. Nunez noted that plaintiff's father had died, and that she "appeared very depressed and tearful. Denied suicidal/homicidal ideations." (Id. at 262). Ms. Castillo expressed deep feelings of depression regarding her son's death and now her father's, and also complained of intense physical pain from arthritis. (Id.).

In the last psychotherapy session included in the record, on February 15, 2012, Ms. Nunez noted on that plaintiff complained of a lot of pain, but no side effects from her medications. (Tr. 265). Ms. Nunez found that plaintiff continued to appear depressed and anxious, and their therapy revolved around her grieving of her

13

father and the challenges of raising her 17-year-old daughter as a single parent. (Id.). Treatment plan notes mentioned continuing physical therapy. (Id.)

### c. Psychiatric Care

Treatment notes indicate that during the same time frame in which Ms. Castillo received psychotherapy from social workers at the Emma L. Bowen Community Service Center, she also received treatment from Dr. Hilda Brewer, M.D., a staff psychiatrist. (Tr. 252, 256, 259, 264). Dr. Brewer also submitted a summarizing "Mental Assessment of Ability to do Work-Related Activities" dated February 26, 2012). (Id. at 266-69).

Dr. Brewer entered a change on July 7, 2011 from Dr. Kury's initial diagnosis to major depressive disorder, recurrent, severe, with psychotic features (DSM-IV 296.34) and post-traumatic stress disorder (DSM-IV 309-81). (Tr. 252). She continued to defer an Axis II diagnosis, and evaluated her GAF at 55. (Id.). Ms. Castillo was not deemed to be a risk for substance abuse. (Id. at 255). At the next appointment, on December 6, 2011, Dr. Brewer noted that plaintiff reported improvement with medicine and that she was not experiencing side effects. (Id. 256). Plaintiff reported "hearing voices calling her name. She sees shadows, but less than in the

14

past." (Id.). Ms. Castillo further informed Dr. Brewer that she was eating better and sleeping well at that time. (Id.). Considering the reported hallucinations, Dr. Brewer increased the medications Geodon[11] and Prozac,[12] and renewed the BuSpar.

Dr. Brewer treated Ms. Castillo again on January 4, 2012 for complaints of not sleeping well. (Tr. 259). She reported no side effects from her medications, and noted fewer auditory and visual hallucinations. (Id.). Dr. Brewer increased the Prozac for depression and renewed the Geodon and BuSpar. (Id.). She also prescribed Ambien to assist with the sleep issues. (Id.).

The last treatment note from Dr. Brewer details a patient visit on February 3, 2012, in which Ms. Castillo reported sleeping better with the Ambien, but not eating well, and generally being dysphoric. (Tr. 264). Dr. Brewer noted that plaintiff appeared upset that she could not attend her father's funeral. (Id.). Ms.

---

[11] Geodon is a brand name for ziprasidone, a drug used for treatment of psychotic conditions such as bipolar disorder. Known side effects include dizziness, arrhythmias, and fatigue. 3 Attorneys Medical Deskbook § 39:8.

[12] Prozac is a brand name for fluoxetine, a drug applied to many psychiatric conditions, including bipolar disorder, depression, panic, PTSD, and social anxiety. Potential side effects include dizziness, agitation, insomnia, and seizures. 3 Attorneys Medical Deskbook § 39:8.

Castillo reported that she was still seeing shadows, but denied auditory hallucinations. (Id.). Dr. Brewer renewed plaintiff's prescriptions for Geoden, Busper, and Ambien. She also increased plaintiff's Prozac dosage. (Id.).

Dr. Brewer's summarizing patient evaluation, submitted on February 26, 2012, evaluated plaintiff's ability to adjust to a job. She designated as "poor or none" plaintiff's ability to follow work rules, interact with supervisors, deal with work stresses, and function independently. (Tr. 267). She evaluated plaintiff's occupational adjustment abilities as "fair" for relating to co-workers, dealing with the public, and using judgment. (Id.). Dr. Brewer specified plaintiff's limitations as appearing "depressed, tearful, anxious and with panic attacks. Memory and concentration problems as well as auditory and visual hallucinations." (Id.).

As for Ms. Castillo's ability to "understand, remember and carry out complex job instructions," Dr. Brewer rated her as "poor or none." (Id. at 268). Dr. Brewer rated plaintiff as "fair" for her abilities to "understand, remember and carry out detailed, but not complex, job instructions," and to "understand, remember and carry out simple job instructions." (Id. at 268). Dr. Brewer rated plaintiff's ability to "behave in an emotionally stable manner"

16

and "relate predictably in social situations" as "poor or none." (Id.). She rated plaintiff's ability to "maintain personal appearance" and "demonstrate reliability" as fair. Dr. Brewer attributed the ratings to plaintiff's "many and cumulating problems." (Id.). Dr. Brewer indicated that plaintiff would not be able to "manage benefits in . . . her own best interest." (Id. at 269). She reported additional work-related limitations due to plaintiff's fear of noise and people, as well as her problems with concentration, memory, and finishing tasks. (Id.).

### 3. Other Treating Physicians

A page in the record dated June 5, 2012 entitled "Claimant's Medications" indicates prescriptions for Lexapro, fluoxetine, amlodipine,[13] and cyclobenzaprine[14] by a physician named "Dr. Rosario." (Tr. 280). There is no indication of who this doctor is

---

[13] Amlodipine belongs to a class of drugs known as calcium channel blockers, and it is used to treat high blood pressure. "Drugs and Medications, WebMD, http://www.webmd.com/drugs/2/drug-5891/amlodipine-oral/details (last visited Nov. 20, 2014).

[14] Cyclobenzaprine is an adjuvant pain drug, meaning that it has an incidental benefit effective on a certain type of pain. Cyclobenzaprine is used frequently when muscle spasms are an element of pain. 2 Attorneys Medical Deskbook § 26:28

or in what context plaintiff came to have medications prescribed by him or her.

## C. Medical Records: Consulting Physicians and Mental Health Professionals

### 1. Consulting Psychologist Haruyo Fujiwaki

Dr. Haruyo Fujiwaki, of Industrial Medicine Associates, P.C. of New York City, conducted a psychiatric evaluation of Ms. Castillo on December 19, 2011. (Tr. at 209). Plaintiff was accompanied by her daughter and assisted by a Spanish translator. (Id.). The consultant took a patient history and detailed her current psychological and physical functioning. (Id. at 209-10).

During the examination, Dr. Fujiwaki noted that plaintiff responded cooperatively, related and presented adequately, dressed casually, groomed adequately and spoke clearly, with no evidence of hallucination, delusions, or paranoia. (Tr. 210). Plaintiff's sensorium was clear, as were her insight and judgment. (Id.). Dr. Fujiwaki described her mood and affect as dysphoric, her attention, concentration, and recent and remote memory skills as mildly impaired, and her cognitive functioning as below average. (Id. at 211).

18

Dr. Fujiwaki determined that plaintiff would be able to "follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, [and] learn new tasks." (Tr. 211). Dr. Fujiwaki noted that while plaintiff can make appropriate decisions, she "can perform complex tasks with some difficulty and needs supervision." (Id.).

Dr. Fujiwaki diagnosed plaintiff on Axis I with "depressive disorder, NOS [not otherwise specified]" and "anxiety disorder, NOS [not otherwise specified]," and deferred an Axis II assessment. (Tr. 211). His Axis III indication was that high blood pressure, heart disease, back pain, and bone aches affected her psychiatric conditions. (Id. at 211-212). He did not provide an Axis IV or Axis V analysis. He recommended continued psychological and psychiatric testing and gave her a fair prognosis. (Id. at 212).

## 2. Consulting Physician Aurelio Salon

Dr. Aurelio Salon, a physician practicing internal medicine at Industrial Medicine Associates, P.C. of New York City, conducted a physical evaluation of Ms. Castillo on December 19, 2011. (Tr. 213-17). Dr. Salon took a patient history, reviewed her medications, and measured her height (62"), weight (144 lbs.),

19

blood pressure (100/70), pulse (72 bpm), and respiration (14/min). (Id. at 213-14).

Dr. Salon noted that plaintiff was obese, but did not otherwise appear to be in any acute distress. (Tr. 214). He observed that her gait, stance, skin and lymph nodes, chest and lungs, head and face, eyes, ears, nose, throat, neck, and heart all looked and functioned normally. (Id. at 214-215). Dr. Salon also reviewed an x-ray of plaintiff's lumbosacral spine conducted December 20, 2011 by IMA Disability Services (id. at 217) and confirmed from that image that she had a mild levoscoliosis of the lumbar region. (Id. at 216).

Dr. Salon diagnosed a history of anxiety/depression, low back pain, hypertension, arthritis, and obesity. (Tr. at 216). Dr. Salon opined that "there are no objective findings to support the fact that the claimant would be restricted in her ability to sit or stand, or in her capacity to climb, push, pull, or carry heavy objects." (Id.).

### 3. Psychiatric Review by V. Reddy

An individual identified only as "Reddy, V., Psychology" prepared a Psychiatric Review Technique (Form SSA-2506-BK) on

January 4, 2012. (Tr. 218-31).   There is no indication of the
professional qualifications of this consultant. This review of
records was done without forms that Ms. Castillo was to complete,
nor did it consider records from her treating psychiatrists and
therapists. (Id. at 234).

The consultant evaluated plaintiff's psychiatric conditions
with respect to the "Criteria B"[15] and "Criteria C"[16] of Listings
12.04 and 12.06 and noted that plaintiff had an affective disorder
resulting in moderate difficulties in maintaining concentration,
persistence or pace; a mild limitation in daily living activities

---

[15] The term "B criteria" refers to paragraph B of Listings
of 12.04 and 12.06. To satisfy the "paragraph B" criteria, the
mental impairment must result in at least two of the following:
(1) marked restriction of activities of daily living; (2)marked
difficulties maintaining social functioning; (3) marked
difficulties in maintaining concentration, persistence, or pace;
(4)repeated episodes of decompensation, each of extended
duration. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04 (B),
12.06(B).

[16] The term "C criteria" refers to paragraph C of Listings
12.04 and 12.06. Paragraph C requires a medically documented
chronic affective disorder of at least 2 years' duration, with
at least one of the following: (1) repeated episodes of
decompensation, each of extended duration; (2)a residual disease
process that resulted in such a marginal adjustment that even a
minimal increase in mental demands of change in the environment
would be predicted to cause the individual to decompensate; (3)a
current history of one or more years' inability to function
outside a highly supportive living environment. See 20 C.F.R.
Pt. 404, Subpt. P, App. 1, §§ 12.04 (C), 12.06(C).

21

and maintaining social functioning; and no history of repeated episodes of deterioration. (Tr. 228-29). Based on the previous findings, he stated that the evidence did not establish the presence of the "C criteria." (Id. at 229).

The consultant also completed a Mental Residual Functional Capacity Assessment on January 4, 2012. (Tr. 232-235). This assessment indicated that plaintiff's abilities to remember locations, work-like procedures, and "very short and simple instructions" were not significantly limited. (Id. at 232). However, plaintiff was deemed moderately limited in understanding and remembering detailed instructions. (Id.). In the areas of "sustained concentration and persistence", plaintiff's "ability to carry out detailed instructions," "ability to maintain attention and concentration for extended periods," and "ability perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances" were also considered to be moderately limited. (Id.). Plaintiff was otherwise not found to be significantly limited in this area. (Id. at 232-233). Other than rating plaintiff as moderately limited in her "ability to respond appropriately to changes in the work setting," the remainder of the report indicates that plaintiff is not significantly limited in the areas of social interaction or adaptation. (Id. at 234).

The narrative assessment indicates that plaintiff would be able to perform simple tasks, but would experience some difficulty "following a schedule, performing complex tasks, relating to others and dealing w[ith] stress." (Tr. 234). The consultant concluded that plaintiff's mental residual functional capacity supported simple-task work and that her functional limitations due to mental impairment are "partially credible when considering past/current treatment, MSE [Mental Status Exam] findings, and range of ADL's [Activities of Daily Living]." (Id. at 234).

### D. Vocational Expert Testimony at the Hearing

Helene Feldman, a certified Provider Identifier, Employee Assistance Professional, and Rehabilitation Counselor (Tr. 198-200), provided vocational expert testimony concerning the potential jobs that exist in the national economy for an individual with plaintiff's functional capacity. (Id. at 54-71). Ms. Feldman based her testimony on her review of the record, the plaintiff's testimony at the hearing, and the ALJ's posited assumptions stating plaintiff's limitations. (Id. at 54).

The ALJ asked Ms. Feldman to provide a vocational analysis for a claimant such as plaintiff who could "do a full range of medium work," but with the limitations of avoiding unprotected

heights and hazardous machinery. (Tr. 54-55). The ALJ also added the mental functional limitations that plaintiff could

> remember, understand, and carry out simple instructions, make simple work related decisions, maintain attention and concentration for two hour segments, could maintain a regular schedule with only occasional close interpersonal contact with others, and could work a job with only minimal production quotas.

(Id. at 55). Plaintiff's counsel objected to the question regarding plaintiff's vocational capacity, because "I don't think it's based on the medical evidence in the record," and the ALJ noted the objection. (Id.). Ms. Feldman replied that plaintiff would not be able to do her past work as a cleaner or home attendant, given that vocational profile. (Id.).

ALJ Solomon then asked whether there were any jobs within the national or regional economy for an individual with the vocational profile he had provided. (Id. at 55-56). Ms. Feldman responded that three jobs existed for such an individual: a food service worker in a hospital setting (DOT code 319.677-014), a hand packer (DOT code 920.587-018),[17] and a general helper in food preparation

---

[17] The transcript indicates DOT code 920.582-018; however, the DOT does not contain such a code. The most likely code is

(DOT code 522.686-014). (Id. at 56).[18] Ms. Feldman indicated that the respective numbers in the national and regional economies for those three positions were 194,950 and 13,600 for hospital food service worker, 676,870 and 28,300 for hand packer, and 11,218,710 and 603,580 for general helper in food preparation. (Id.).

The ALJ then asked the vocational expert how her evaluation would change if he were to find credible plaintiff's doctor's evaluation that she could only sit for a total of two hours a day, stand for up to 30 minutes total in an eight-hour day, and lift only 20 pounds occasionally and five pounds frequently, with additional limits on pushing, pulling, and fine manipulations. (Id. at 56-57). Ms. Feldman replied that such limitations would preclude job opportunities in the national economy. (Id. at 57).

After this exchange, the ALJ asked follow-up questions related to plaintiff's inability to meet more than "minimal

--------------------

920.587-018 for "Packager, Hand (any industry)." 2 Dictionary of Occupational Titles 932 (1991).

[18] The Dictionary of Occupational Titles ("DOT"), last published by the U.S. Department of Labor in 1991, provides basic occupational information in the United States Economy. The SSA, by regulation, relies on the DOT extensively to determine if jobs exist in the national economy for which a claimant is qualified, given his or her residual functional capacity. See, e.g. 20 C.F.R. §§ 404.1566-404.1569, 416.966-416.969.

production quotas" in her vocational capacity. (Tr. 57). The vocational expert answered that she was not familiar with whether the hand-packer job had high or minimal production quotas. (Id.). The ALJ requested "another job [than hand packer] that would perhaps fit the definition . . ." and Ms. Feldman suggested stock clerk (DOT code 299.367-014). (Id. at 58). However, that job had an SVP[19] of 4, to which ALJ Solomon promptly noted "SVP of 4 would not fit. . . ." (Id.). The expert suggested a kitchen helper (DOT code 31.687-010), with an SVP of 2 and respective national and regional numbers of 512,990 and 36,620. (Id. at 58-59).

After being questioned by the ALJ, Ms. Feldman was also questioned by plaintiff's attorney, Michael Morris. (Id. at 59-71). Mr. Morris focused on the issue of minimal production quotas and questioned Ms. Feldman about what being a food service worker in a hospital setting entailed. (Id. at 59). Ms. Feldman explained that she would need to research the DOT to answer that question,

---

[19] SVP stands for specific vocational preparation, and the DOT assigns an SVP for each described occupation. Using the skills level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT. DI 25015.030 "Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions" — SSR 00-4p.

but also that she had answered the judge's query about suitable jobs based on her personal knowledge. (Id. at 59-60). The ALJ, attorney, and vocational expert reached the conclusion that while there were production quotas involved in preparing food trays in a hospital setting, "it's not like a factor where you have to turn things out . . . fast paced" or as on "an assembly line." (Id. at 61-62). After further questioning on this topic, the vocational expert explained that high production quotas would be directly related to how many patrons are served and the size of the establishment; however, she could not provide an estimate for the percentage of food service jobs that she had cited, which specifically had minimal production quotas. (Id. at 66-67).

Ms. Feldman agreed with plaintiff's counsel that some of the jobs in hospital food service would not have the minimal production quotas that would be needed to fit plaintiff's vocational capacity. (Tr. 68). She also agreed that some of the jobs as a general helper or hand packer would have production quotas higher than the plaintiff could handle. (Id.). When asked about plaintiff's need for modest accommodations related to her limitations in maintaining a regular schedule, the vocational expert indicated that if plaintiff were unable to maintain a regular work schedule -- for instance, arriving late or needing unscheduled breaks --

for as little as ten percent of a work week, she would "probably not" be employable. (Tr. 71).

## III.  Standards for Disability Insurance Benefits Eligibility

In order to qualify for disability insurance benefits, a claimant must demonstrate that she was disabled as of a date on which she was still insured. See, e.g., Arnone v. Bowen, 882 F.2d 34, 37 (2d Cir. 1989)(citing 42 U.S.C. § 423(a)(1)(A)); Fleming v. Astrue, 2010 WL 4554187, *9 (E.D.N.Y. Nov. 2, 2010). For purposes of eligibility for benefits, an applicant is "disabled" within the meaning of the Act if she is unable "'to engage in any substantial gainful activity[20] by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months.'" Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 641-42 (2d Cir. 1983) (quoting 42 U.S.C. § 423(d)(1)(A)). The Act requires that the relevant physical or mental impairment be "'of such severity that [plaintiff] is not only unable to do his previous work but cannot,

---

[20] "Substantial gainful activity" is defined as work that "[i]nvolves doing significant productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F. R. § 404.1510; see, e.g., Craven v. Apfel, 58 F. Supp. 2d 172, 183 (S.D.N.Y. 1999); Pickering v. Chater, 951 F. Supp. 418, 424 (S.D.N.Y. 1996).

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004) (quoting 42 U.S.C. § 423(d)(2)(A)). If the claimant can perform substantial gainful work existing in the national economy, it is immaterial, for the purposes of the Act, that an opening for such work may not be found in the immediate area where she lives or that a specific job vacancy may not exist. 42 U.S.C. § 423(d)(2)(A).

In assessing a claim of disability, the Commissioner must consider: "(1) objective medical facts; (2) diagnoses or medical opinions based on those facts; (3) subjective evidence of pain and disability testified to by claimant and other witnesses; and (4) the claimant's background, age, and experience." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 259 (2d Cir. 1988). The SSA regulations set forth a five-step sequential process under which an ALJ must evaluate disability claims. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920. The Second Circuit has described this sequential process as follows:

> First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Secretary next considers whether the claimant has a "severe impairment" which significantly

29

limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment,[21] the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.[22] Finally, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the claimant could perform." The burden of proving disability, encompassing the first four of

---

[21] If a claimant has a "listed" impairment, she will be considered disabled per se without an additional assessment of vocational factors such as age, education, and work experience. If the plaintiff does not have a listed impairment, the Commissioner must consider plaintiff's residual functional capacity, which is her ability to do physical and mental work activities on a sustained basis, despite limitations from her impairments. See, e.g., Bush v. Shalala, 94 F.3d 40, 45 (2d Cir. 1996). To determine whether the applicant has a listed disorder, the ALJ must consult the relevant criteria for each listing. "The criteria in paragraph A substantiate medically the presence of a particular mental disorder" while "[t]he criteria in paragraphs B and C describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpt. P, App. 1, § 12(A).

[22] Residual functional capacity is a claimant's maximum remaining ability, despite her limitations, "'to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the residual functional capacity assessment must include a discussion of the individual's abilities on that basis.'" Schultz v. Astrue, 2008 WL 728925, *6 (N.D.N.Y. Mar.18, 2008) (quoting Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999)).

> these steps, is on the claimant. The burden of proving the fifth step is on the Secretary.

Bush, 94 F.3d at 44-45 (emphasis in original) (quoting Rivera v. Schweiker, 717 F.2d 719, 722-23 (2d Cir. 1983)); see also Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

At the fourth step, which requires determining the RFC, if a claimant has more than one impairment, all medically determinable impairments must be considered, including those that are not "severe." 20 C.F.R. § 404.1545(a)(2). The assessment must be based on all relevant medical and other evidence, such as physical abilities, mental abilities, and symptomology, including pain and other limitations that could interfere with work activities on a regular and continuing basis. 20 C.F.R. § 404.1545(a)(1)-(3).

Normally, in meeting her burden on the fifth step, the Commissioner may rely on the Medical-Vocational Guidelines contained in 20 C.F.R. Part 404, Subpart P, Appendix 2, commonly referred to as "the Grid[s]."[23] Zorilla, 915 F. Supp. at 667.

---

[23] "The Grid classifies work into five categories based on the exertional requirements of the different jobs." Zorilla v. Chater, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996). "Specifically, it divides work into sedentary, light, medium,

31

> When the limitations and restrictions imposed by your
> impairment(s) and related symptoms, such as pain,
> affect only your ability to meet the strength demands
> of jobs, . . . and your specific vocational profile is
> listed in a rule contained in appendix 2, we will
> directly apply that rule to decide whether you are
> disabled.[24]

20 C.F.R. § 416.969a(b). However, if a claimant suffers from non-exertional limitations,[25] exclusive reliance on the Grids is inappropriate. See Butts, 388 F.3d at 383 (citing Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999)).

————————————————

heavy, and very heavy, based on the extent of the requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling." Id. Based on these factors, the SSA uses the Grids to evaluate whether the claimant can engage in any other substantial gainful work that exists in the economy. Id. at 667.

[24] "Limitations are classified as exertional if they affect your ability to meet the strength demands of jobs. The classification of a limitation as exertional is related to the United State Department of Labor's classification of jobs by various exertional levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling." All other limitations are considered non-exertional. 20 C.F.R. 416.972a.

[25] "'[L]imitations or restrictions which affect [a claimant's] ability to meet the demands of jobs other than the strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling, are considered non-exertional.'" Samuels v. Barnhart, 2003 WL 21108321, *11 n.14 (S.D.N.Y. May 14, 2003) (quoting 20 C.F.R. § 416.969a(a)); see also 20 C.F.R. § 404.1569a(c).

The Second Circuit has consistently emphasized the importance of the Commissioner's burden to support her step-five determination with substantial evidence, and has held that a reversal with a remand only to calculate damages is warranted when the ALJ has failed to meet that burden. Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000)(holding that no purpose would be served by remanding the case for rehearing where the ALJ's finding of the claimant's RFC was not supported by substantial evidence); Rosa, 168 F.3d at 80-81 (holding that the ALJ could not rely on consulting expert reports when those reports were silent on the subject of the claimant's exertional capability, and therefore remanding for damage calculations); Balsamo v. Chater, 142 F.3d 75, 82 (2d Cir. 1998)(remanding an appeal for calculation of damages because the record did not support the ALJ's RFC determination and finding it unlikely that the Commissioner could produce new and material evidence, or could show good cause for having failed to produce substantial evidence in the original proceeding); Carroll, 705 F.2d at 643-44 (holding that a rehearing was not needed when the failure to sustain the burden at step five is the sole reason for remand, that four years had elapsed since the claimant applied for benefits, and that a rehearing would only delay the benefits likely due to the claimant). Nonetheless, remanding only for benefits calculation "is an extraordinary

action and is proper only when further development of the record
would serve no purpose." Baldwin v. Astrue, 2009 WL 4931363, *19
(S.D.N.Y. Dec. 21, 2009)(citing Rivera v. Barnhart, 379 F. Supp.
2d 599, 604 (S.D.N.Y. 2005).

## IV.   The ALJ's Decision

On July 12, 2012, ALJ Solomon issued a decision finding that
plaintiff was not disabled within the meaning of the Act. (Tr. at
14). Because plaintiff had filed a prior application for disability
benefits on January 31, 2011 and the claim had been denied on May
6, 2011, the ALJ noted that that previous decision had become
final, making May 7, 2011 the first procedurally relevant date for
plaintiff's current claim. (Id.). The ALJ noted that plaintiff's
earning record shows that "plaintiff has acquired sufficient
quarters of coverage to remain insured through December 31, 2015."
(Id.).

At step one, the ALJ reported that plaintiff had not engaged
in substantial gainful activity since May 7, 2011.   (Tr. 16).

At step two, the ALJ concluded that plaintiff had severe
impairments, including lumbosacral levoscoliosis and a major

34

depressive disorder. (Tr. 16). The ALJ found that there was a lack of medical evidence to support plaintiff's claims of arthritis. (Id.). The ALJ dismissed Dr. Reyes's report as insufficient to support a finding that plaintiff suffered from a medically determinable impairment associated with her thoracic spine or left knee. (Id. at 16-17). ALJ Solomon alluded to the finding of consulting physician Dr. Salon, that plaintiff suffered from obesity, but observed that Dr. Salon had not stated that the obesity by itself, or in combination with Ms. Castillo's other impairments, "imposed any limitations." (Id. at 17). However, the ALJ determined that even if plaintiff did suffer from obesity, it did not amount to a severe medically determinable condition. (Id.)(citing SSR 02-1p).

At step three, the ALJ found that plaintiff did not meet the regulatory criteria for a per se disability due to a severe affective disorder under section 12.04. (Tr. 17).[26] First, the ALJ

---

[26] In order to decide whether plaintiff's mental impairment meet the criteria of the listing 12.04 for affective disorders, the ALJ reviewed plaintiff's case to see whether plaintiff's mental impairment has at least two of the following to satisfy the "paragraph B" criteria: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes

noted that plaintiff had only mild restrictions to her activities

of daily living. (Tr. 17). While the ALJ acknowledged evidence

that plaintiff was unable to travel by train and limited to taking

the bus, he found that evidence undermined by the fact that she

had traveled to the Dominican Republic and that she could take

care of both her own needs and those of her 17-year-old daughter.[27]

(Id.). Second, the ALJ found that plaintiff's limitations in social

function were only moderate and not marked, because she was able

to travel to the Dominican Republic. (Id. at 17-18). Third, the

ALJ found that plaintiff's difficulties with concentration,

persistence, or pace were only moderate and not marked, because

the more significant problems in this area documented by treating

psychiatrist Dr. Brewer were not corroborated in the consulting

psychiatric review. (Id. at 18). Fourth, the ALJ determined that

plaintiff had not experienced any episodes of decompensation that

met the standards within section 12.00(C). (Id.). Since the ALJ

did not find evidence of at least two "marked" limitations, or one

"marked" limitation and repeated episodes of decompensation, she

---

of decompensation, each of extended duration. (Tr. 17). See 20
C.F.R. § 404, Subpart P, App. 1, §§ 12.04, 12.08.
    [27] The ALJ placed heavy weight on the fact that plaintiff
had travelled to the Dominican Republic, mentioning it four
separate times in his decision as undermining of her
credibility. (Tr. 17 (twice), 19, 21).

did not meet the "paragraph B" criteria for a finding of disability due to mental impairment at step three. (Id.).

ALJ Solomon also determined that the evidence failed to establish the presence of "paragraph C" criteria for finding at step three that plaintiff was disabled due to a mental impairment related to an affective disorder. (Id. at 18). The "paragraph C" criteria require a claimant to demonstrate that her history of a chronic affective disorder has lasted at least two years and has caused "more than a minimal limitation of ability to do basic work activities. . . ." 20 C.F.R. Pt. 404, Subtpt. P, App. 1, § 12.04(C). The ALJ did not elaborate on his finding here, although it is possible that he assumed that because the procedurally relevant date for plaintiff's claim was May 7, 2011, the evidence provided did not meet the two-year durational requirement.

In his step-four evaluation, the ALJ assessed plaintiff's residual functional capacity ("RFC") with guidance from the categories of mental disorders found in the 12.00 listings, and found that she could perform medium work,[28] with "the need to avoid

---

[28] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds," in addition to the capabilities of sedentary and light work. 20 C.F.R § 404.1568(c).

unprotected heights and working with hazardous machinery," and limiting her occupation to ones with simple instructions, demanding no more than two-hour segments of concentration, and requiring only "minimal production quotas." (Tr. 18-19). The ALJ indicated that he considered all symptom to the extent that they were consistent with "other objective medical evidence," and complied with sections 404.1529 and 404.1527 of the federal regulations, as well as Social Security regulations 96-4p, 96-7p, 96-2p, 96-5p, 96-6p, and 06-3p in evaluating evidence.[29] (Id. at 19).

---

[29] 20 C.F.R. § 404.1529 lays out how the SSA evaluates symptoms, including pain; § 404.1527 explains how opinion evidence is evaluated. SSR 96-4p addresses "Symptoms, Medically Determinable Physical and Mental Impairments, and Exertional and Nonexertional Limitations"; SSR 96-7p addresses "Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements"; SSR 96-2p addresses "Giving Controlling Weight to Treating Source Medical Opinions"; SSR 96-5p addresses "Medical Source Opinions on Issues Reserved to the Commissioner"; SSR 96-6p addresses "Consideration of Administrative Findings of Fact by State Agency Medical and Psychological Consultants and other Program Physicians and Psychologists at the Administrative Law Judge and Appeals Council Levels of Administrative Review: Medical Equivalence"; and SSR 06-3p addresses "Considering Opinions and Other Evidence from Sources Who Are Not 'Acceptable Medical Sources' in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies."

The ALJ utilized a two-step process to determine plaintiff's RFC at step four. He first identified the "medically acceptable clinical and laboratory diagnostic techniques [] that could reasonably be expected to produce the claimant's pain and other symptoms," and then he made credibility findings regarding any evidence of pain or symptoms that exceeded the expectations arising from this objective medical evidence. (Tr. 19).

In the first step, the ALJ found little documentation of physical conditions that could produce severe restrictions. (Id. at 20). He noted that plaintiff claimed a five- to six-year history of low back pain and joint pain associated with arthritis; however, he found this history to be undermined by the facts that (1) plaintiff "was able to perform medium to heavy work until December 2010," and (2) there was no medical evidence that her condition had worsened around the time that she terminated that work. (Id.). The ALJ also stated, incorrectly,[30] that there was no indication of arthritis in any medical report. (Id.).

_____

[30] We note that in addition to plaintiff's own testimony, Dr. Reyes's report, an x-ray, records from the Emma L. Bowen Community Service Center, and even the consultative physician's report all refer to patient's osteoarthritis. (Tr. 47, 53, 273-74, 262, 216). See discussion infra page 70.

As for plaintiff's psychological impairments, the ALJ found that reports of her auditory and visual hallucinations were not credible because of inconsistencies both among visits two weeks apart in April 2011 with treating care givers at the Emma L. Bowen center, and between treating psychiatrist Dr. Brewer's treatment notes on December 6, 2011 and consultative psychologist Dr. Fujiwaki's notes on December 19, 2011. (Tr. 20). Moreover, ALJ Solomon stated that plaintiff's ability to travel to the Dominican Republic in late December of 2011 -- even in the company of two family members -- significantly undermined her claims of psychological impairment. (Id. at 20-21). The ALJ also asserted that plaintiff's claims of incapacitating side effects from her medications were undermined by the consistent documentation in the Emma L. Bowen Center staff's treatment notes that she did not complain of any side effects. (Id. at 21).

The ALJ modified the finding of medium strength to accommodate plaintiff's dizziness, limited cognitive and concentration powers, and inter-personal challenges. He did so despite his finding a lack of credibility in her account of regarding the severity of her symptoms. (Tr. 21).

Based on his RFC finding, ALJ Solomon determined that plaintiff was incapable of performing her past work as a home attendant or an office cleaner. (Tr. at 21). He relied on the vocational expert's analysis in reaching this decision. (Id.).

At step five, the ALJ concluded that there were a significant number of jobs within plaintiff's abilities, including food service worker in a hospital setting, general helper, food preparer, and kitchen helper. (Tr. 22). He noted that plaintiff was fifty years old at the time of her disability, defining her as "approaching advanced age" for the purposes of his vocational finding. (Id.). He also noted that her inability to communicate in English means that she is to be evaluated as if she were illiterate. (Id.; see also 20 C.F.R. § 404.1564). The ALJ stated that Medical-Vocational Rule 203.19[31] of "the Grids" might have applied to plaintiff had he not placed some nonexertional limitations on plaintiff's ability to perform the "medium" occupational base. (Tr. 22). Relying on the vocational expert's testimony, the ALJ nonetheless found that there were sufficient

---

[31] A claimant is found "not disabled" under Rule 203.19 when she is closely approaching advanced age, has a limited or less education, and skilled or semi-skilled previous work experience. 20 C.F.R. Pt. 404, Subpt. P, App. 2.

41

jobs available in the regional economy that matched plaintiff's vocational profile to find her not disabled. (Id. at 22-23).

## V.   This Case

On July 22, 2013 plaintiff filed the present action, seeking review of the SSA's decision. She argues that the Commissioner's findings are erroneous and contrary to the law. (Compl. ¶ 13). The parties have cross-moved for judgment on the pleadings.

## ANALYSIS

## I.   Standards of Review

When a claimant challenges the SSA's denial of disability insurance benefits, the court may set aside the Commissioner's decision only if it is not supported by substantial evidence or was based on legal error. Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)); see also 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive").

42

Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004). The substantial-evidence test applies not only to the Commissioner's factual findings, but also to inferences to be drawn from the facts. See, e.g., Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999). In determining whether the record contains substantial evidence to support a denial of benefits, the reviewing court must consider the whole record, weighing the evidence on both sides of the question. See, e.g., Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)); Williams, 859 F.2d at 258.

It is the duty of the Commissioner, not the courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant. See Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). However, "[i]n the absence of a medical opinion to support the ALJ's finding as to [a plaintiff]'s ability

. . ., it is well-settled that 'the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. . . .'" Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998)(quoting McBrayer v. Secretary of Health and Human Servs., 712 F.2d 795, 799 (2d Cir. 1983)).

In addition to considering the sufficiency of the evidence in the record, a reviewing court must consider the ALJ's application of the law to the record before him. Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 422 (S.D.N.Y. 2010). Even if the record, as it stands, contains substantial evidence of disability, the SSA decision may not withstand challenge if the ALJ committed legal error. Balsamo, 142 F.3d at 79.

Of particular importance, as disability benefits proceedings are non-adversarial in nature, the ALJ has an affirmative obligation to fully develop the administrative record, even when a claimant is represented by counsel. Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508-09 (2d Cir. 2009) (citing Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999) (internal quotation marks omitted)); see also Butts, 388 F.3d at 386. To this end, the ALJ must make every reasonable effort to help an applicant get medical reports from her medical sources. 20 C.F.R. §§ 404.1512(d), 416.912(d).

44

Ultimately, "[t]he record as a whole must be complete and detailed enough to allow the ALJ to determine claimant's residual functional capacity." Casino Ortiz v. Astrue, 2007 WL 2745704, *7 (S.D.N.Y. Sept. 21, 2007) (citing 20 C.F.R. § 404.1513(e)(1)-(3)). The ALJ may not reject a treating source's diagnosis without first seeking additional evidence or clarification when the "report from [claimant's] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." Bonet v. Astrue, 2008 WL 4058705, *18 (S.D.N.Y. Aug. 22, 2008) (citing 20 C.F.R. § 416.912(e)(1); see, e.g., Rosa, 168 F.3d at 79; Clark v. Comm'r of Social Security, 143 F.3d 115, 117-18 (2d Cir. 1998)).

The ALJ must also adequately explain his reasoning in making the findings on which his ultimate decision rests, and in doing so must address all pertinent evidence. See, e.g., Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995); Ferraris, 728 F.2d at 586-87; see also Allen ex rel. Allen v. Barnhart, 2006 WL 2255113, *10 (S.D.N.Y. Aug. 4, 2006) (finding that the ALJ explained his findings with "sufficient specificity" and cited specific reasons for his decision). While the ALJ need not resolve every conflict in the record, Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981),

"the crucial factors in any determination must be set forth with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984); cf. Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999) (holding that claimant was entitled to an explanation of why the Commissioner discredited her treating physician's disability opinion). An ALJ's "'failure to acknowledge relevant evidence or to explain its implicit rejection is plain error.'" Kuleszo v. Barnhart, 232 F. Supp. 2d 44, 57 (W.D.N.Y. 2002) (quoting Pagan v. Chater, 923 F. Supp. 547, 556 (S.D.N.Y. 1996)).

The Social Security Act authorizes a court, when reviewing decisions of the SSA, to order further proceedings. 42 U.S.C. § 405(g) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."); see Butts, 388 F.3d at 382. If "'there are gaps in the administrative record or the ALJ has applied an improper legal standard,'" the court will remand the case for further development of the evidence or for more specific findings. Rosa, 168 F.3d at 82-83 (quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)). Remand is particularly

appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. Pratts, 94 F.3d at 39. If, however, the reviewing court concludes that an ALJ's determination was not supported by substantial evidence, a remand solely for calculation of benefits may be appropriate. See, e.g., Butts, 388 F.3d at 386 (discussing Curry, 209 F.3d at 124).

## II.   The Parties' Motions

### A. Plaintiff's Arguments

Plaintiff asserts that there are three distinct grounds on which to reverse the Commissioner's determination that she is not disabled:

1. The ALJ failed to properly develop the administrative record when he did not seek treatment notes from treating physicians Dr. Reyes and Dr. Rosario. (Plaintiff's Memorandum of Law ("Pl. Mem."), Dkt. 15, 20-21).

2. The ALJ improperly rejected treating psychiatrist Dr. Brewer's opinions of plaintiff's mental impairments and their impact on her work capabilities. (Id. at 15-20).

3. The vocational expert's testimony was unreliable and should not have been relied upon by the ALJ, because the

vocational expert was unable to identify jobs that fully met the RFC criteria laid out by the ALJ. (Id. at 21-26).

In her reply brief, plaintiff emphasizes that the Commissioner improperly weighed the absence of any hospitalization against the reports and evaluation of the treating psychiatric team. (Plaintiff's Reply Memorandum ("Pl. Reply"), Dkt. 20, 2-4). She also contends that the ALJ did not accord appropriate significance to the GAF score of 55, as that was an evaluation that came early in the patient's treatment history. (Id. at 2-3). Plaintiff also renews her argument that the vocational expert's testimony should have been rejected because she was unable to state whether the job codes that she provided conformed to the ALJ's RFC determination regarding minimal production quotas. (Id. at 4-5).

## B. Defendant's Arguments

Defendant asserts that substantial evidence supports the ALJ's findings as follows:

1. The ALJ correctly employed the SSA standards for evaluating mental disorders at steps two and three. (Defendant's Memorandum of Law ("Def. Mem."), Dkt. 17, 13).

2. The ALJ correctly employed the SSA standards for evaluating physical impairments at steps two and three. (Id. at 14).

3. The ALJ's RFC determination is supported by the record, including the consultative physical and psychiatric reports, and the opinions from plaintiff's treating physicians that plaintiff suffered from greater limitations than those credited by the ALJ's evaluation were not credible. (Id. at 16-21).

4. The ALJ properly assessed plaintiff's credibility; therefore, the court owes deference to the ALJ's findings. (Id. at 21-23).

5. The vocational expert sufficiently addressed the hypothetical posed by the ALJ; therefore, the ALJ was correct to rely on the vocational expert's testimony to find that plaintiff was able to perform work that existed in the national economy. (Id. at 23-25).

## III.   Assessment of the Record

We assess the record and conclude that the ALJ's decision suffers from several defects that justify a remand for further

49

development of the record and for findings supported by substantial evidence.

## A. The ALJ Failed to Acquire Complete Evidence.

The ALJ bears the burden of ensuring that the record as a whole is "complete and detailed enough" to support his determinations. 20 C.F.R. § 404.1513(e)(1)-(3). This requires seeking additional evidence to clarify inconsistencies, ambiguities, and conflicts in the record. § 404.1513(e)(1). Indeed, an ALJ commits legal error when he rejects a medical assessment without having first sought to develop fully the factual record. Rosa, 168 F.3d at 80. The ALJ may even be required to develop the claimant's medical history for a period longer than the twelve-month period prior to the date on which the claimant filed if there is reason to believe that such information is necessary to reach a decision. 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. § 404.1512(d). See Hilsdorf v. Comm'r of Soc. Sec., 724 F. Supp.2d 330, 343 (E.D.N.Y. 2010); see also Pino v. Astrue, 2010 WL 5904110, *18 (S.D.N.Y. Feb. 8, 2010).

When inconsistencies, ambiguities, or lacunae in the evidence from the claimant's treating physicians make that evidence "inadequate for [the ALJ] to determine whether [claimant] is

disabled, . . . [the ALJ] will first recontact [claimant's] treating physician . . . to determine whether the additional information . . . is readily available." 20 C.F.R. § 404.1512(e)(1). If there is an ambiguity regarding whether a treating physician's statement bears on the alleged period of disability, the ALJ must seek to resolve this ambiguity through additional medical evidence. Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)(citing 20 C.F.R. § 404.1512(e)). In addition, the ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record. See Rosa, 168 F.3d at 80 (citing Clark, 143 F.3d at 118); see also Calzada v. Astrue, 753 F. Supp.2d 250, 278 (S.D.N.Y. 2010)("[I]f a physician's report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician, as needed, to fill any clear gaps before rejecting the doctor's opinion.").

### 1. Dr. Reyes

Here, the ALJ failed to fully develop the record for plaintiff's treating physician, Dr. Reyes. He then compounded that error by using the fact that this documentation was lacking to reject Dr. Reyes's opinions. Dr. Reyes was plaintiff's treating

51

physician, whom Ms. Castillo saw every three to four months since 2003. (Tr. 20). However, the only documentation relating to treatment by Dr. Reyes is a form titled "Medical Assessment Physical Ability-Work Related" dated December 6, 2012. (Id. at 270-277).

Despite the longevity of the treating relationship between Dr. Reyes and plaintiff, ALJ Solomon gave no weight to Dr. Reyes's opinions in the medical assessment because "Dr. Reyes has not provided any treatment notations or clinical test results." (Tr. 20). Additionally, the ALJ did not credit Dr. Reyes' determination that plaintiff had a severe medically determinable impairment associated with her thoracic spin or left knee, because the report Dr. Reyes provided diagnosed only back pain and low back pain. (Id. at 16-17).

Considering that Dr. Reyes's was plaintiff's treating physician since April 2003, the ALJ's failure to seek treatment notes from Dr. Reyes renders suspect any weighting he gave to her opinion. On remand, the Commissioner should request complete notes from Dr. Reyes and evaluate them fully.

### 2. **Dr. Brewer and Affiliated Psychotherapists at the Emma L. Bowen Center**

ALJ Solomon erred when he decided not to credit the opinion of Dr. Brewer with regard to plaintiff's mental impairments because of purported inconsistencies and uncorroborated claims. (Tr. 17-18). In particular, the ALJ dismissed the credibility of Dr. Brewer as "significantly limited" because of inconsistencies regarding plaintiff's claims of auditory and visual hallucinations -- there was no mention of these issues at her April 11, 2011 intake visit, but there were mentions two weeks later and again in December and January. (Id. at 20). The ALJ also noted that the consultative psychiatrist did not identify any evidence of hallucinations. (Id.).

The ALJ fails to explain why a patient is suspect if she mentions symptoms on a second and third visit, but not the first. He also fails to suggest how a psychologist may be expected to acquire evidence of hallucinations except through the patient's reporting. In any event, the ALJ apparently never sought an explanation from Dr. Brewer concerning the perceived inconsistencies in her records.

The ALJ mentioned a second purported problem with Dr. Brewer's notes. Dr. Brewer indicated that plaintiff's physical ailments were a contributing factor to her mental impairments, but the ALJ found that the medical record did not support evidence of arthritis. Instead, he characterized plaintiff's statements to Dr. Brewer about her physical condition as intended "to portray herself as being more limited than she is." (Tr. 21). Here, too, there is no sign that the ALJ reached out to Dr. Brewer or the psychotherapists at the Emma L. Bowen Center to clarify why their treatment notes consistently mentioned Ms. Castillo's back pain and arthritis as significantly exacerbating issues in assessing her mental impairments.

The SSA regulations require the ALJ to make further inquiries when he finds inconsistencies in the evidence provided by treating physicians, but there is no indication that ALJ Solomon did so before rejecting Dr. Brewer's evaluation. On remand, the Commissioner should interrogate the psychiatric staff at the Emma L. Bowen to satisfy any concerns regarding inconsistencies in diagnosis or patient presentation, and then evaluate the evidence fully.

### 3. Dr. Rosario

The ALJ also failed to inquire further about Dr. Rosario, who appears to have prescribed a significant number of medications for plaintiff. (Id. at 280). Dr. Rosario is not mentioned in the ALJ's decision, and there is no indication that the ALJ attempted to supplement the record with information regarding Dr. Rosario and the basis for the prescriptions.

On remand, the Commissioner should seek out the identity of Dr. Rosario and the context of that doctor's prescriptions for plaintiff, including treatment records and opinions of plaintiff's impairments stemming from that treatment. The Commissioner should then evaluate such evidence fully.

### 4. Physical Therapy

During the hearing ALJ Solomon asked Ms. Castillo what treatment she received for her physical ailments, and Ms. Castillo replied that she was receiving physical therapy. (Tr. 49). Dr. Reyes also reported that plaintiff was receiving physical therapy. (Id. at 274). However, there is no reference in the ALJ's decision to plaintiff's physical therapy, nor is there any indication that

the ALJ sought out treatment records related to plaintiff's physical therapy.

On remand, the Commissioner should seek out the identity of the physical therapists and attempt to supplement the record with treatment reports from the physical therapist. The Commissioner should then evaluate such evidence fully.

### B. The ALJ Failed to Apply Appropriately the Treating Physician Rule.

Social Security regulations and Second Circuit precedent require the ALJ to place presumptive weight on the opinions of treating physicians:

> Generally we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "[T]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (internal citations omitted). Among such medically acceptable techniques, "[a] patient's report of complaints, or history, is an essential diagnostic tool." Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003)(quoting Flanery v. Chater, 112 F.3d 346, 350 (8th Cir. 1997).

Typically, the treating physician's opinion is not afforded controlling weight if it is inconsistent with the other medical experts' opinions and not otherwise supported by record evidence. Burgess, 537 F.3d at 128; Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Snell, 177 F.3d at 133. "[A]nd the report of a consultative physician may constitute such evidence." Marquez v. Colvin, 2013 WL 5568718, *12 (S.D.N.Y. Oct. 9, 2013)(quoting Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir.1983)). "However, not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician." Burgess, 537 F.3d at 128.

If an ALJ does not afford the treating physician's opinion controlling weight, he must provide "good reasons" for declining to do so, as well as "good reasons" for according those opinions

whatever weight he assigns to them. Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). Key factors that the ALJ "must consider" include:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

Halloran, 362 F.3d at 32 (citing 20 C.F.R. §§ 404.1527(c), 416.927(c)); accord Clark, 143 F.3d at 118. Moreover, the ALJ may not simply rest on the inadequacy of a treating physician's report to deny that report controlling weight. The Second Circuit has held that "the lack of specific clinical findings in the treating physician's report did not, standing by itself, justify the ALJ's failure to credit the physician's opinion. . . . [I]t was the ALJ's duty to seek additional information from the treating physician sua sponte." Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) (citing Perez, 77 F.3d at 47).

Finally, the Commissioner reserves the authority to issue the opinion on whether a claimant is "disabled." Therefore, neither a treating physician's opinion nor that of a consultative physician is controlling on such determinations. 20 C.F.R. §§ 404.1527(d), 416.927(d).

Here, as discussed supra, the ALJ first erred by not seeking out complete records from plaintiff's treating physicians, Dr. Reyes and Dr. Rosario, and by not clarifying inconsistencies directly with the treating psychiatric team at the Emma L. Bowen Center. Then, compounding the first mistake, the ALJ ignored the precepts of the treating-physician rule when he used the incompleteness of records to discredit entirely Dr. Reyes's opinions and the inconsistencies regarding hallucinations to significantly limit the weight of Dr. Brewer's evidence. (Tr. 20). No mention was made of Dr. Rosario or the psychotherapists who treated plaintiff; implying that no weight was given to that evidence, and without good reason for that decision.

### 1. Dr. Reyes

Simply put, the SSA regulations place a strong presumptive weight on the opinions of a treating physician like Dr. Reyes, who has supervised a patient's care with several visits annually over

the better part of a decade. In addition to having an obligation to seek out fuller documentation from Dr. Reyes, the ALJ was also required to provide good reasons for determining that Dr. Reyes's opinion was not entitled to controlling weight. ALJ Solomon found fault with Dr. Reyes's diagnoses for being focused on symptoms, rather than on medically determinable impairments; however, the ALJ's initial failure to supplement Dr. Reyes's evidence renders immaterial any evaluation of the limited evidence in the record.

On remand, once the Commissioner has supplemented appropriately Dr. Reyes's evidence, any subsequent determination that this evidence is still not deserving of controlling weight must be supported by consideration of factors found in 20 C.F.R. §§ 404.1527(c), 416.927(c).

### 2. **Dr. Brewer and Affiliated Psychotherapists at the Emma L. Bowen Center**

In addition to the inconsistencies regarding hallucinations, ALJ Solomon also found that Dr. Brewer's opinion was contradicted by other evidence in the record, specifically the report by the one-time consulting doctor, Dr. Fujikawi. (Tr. 17-18). Dr. Brewer reported that plaintiff had significantly limited ability to attend and concentrate, but Dr. Fujiwaki found her to have only

moderate limitation. (Id.). Additionally, Dr. Fujiwaki reported that plaintiff had some difficulty relating to others, but not to the marked degree stated by Dr. Brewer. (Id.). These discrepancies, according to the ALJ, did not support the conclusion that Dr. Brewer's analysis of plaintiff was credible. (Id.).

Courts may refuse to uphold an ALJ's decision to reject a treating physician's diagnosis merely on the basis that other examining doctors reported no similar findings. See Rosa, 168 F.3d at 81; see also Carroll, 705 F.2d at 643; cf. Wagner, 906 F.2d at 861 (rejecting argument that Commissioner can "discard a treating doctor's opinion on the basis of prior omissions in the record"). That said, and as we have noted already, the ALJ must also endeavor to clarify omissions, inconsistencies, and ambiguities before evaluating the weight to assign a treating physician's evidence. The ALJ has not done so with regard to Dr. Brewer's treatment notes. Additionally, the regulations clearly warn against reliance on a one-time consultative expert's opinion over the extensive records of a treating physician. Yet here, the ALJ did just that without a proper defense or having first taken the proper steps to supplement and clarify his concerns regarding the treating physician's notes.

The ALJ detailed his findings of inconsistencies between Dr. Brewer's notes and those of the consulting expert, Dr. Fujiwaki. (Tr. 20). However, there is no indication that the ALJ considered Dr. Brewer's notations in the context of the full psychiatric and psychotherapeutic treatment being administered at the Emma L. Bowen center. For instance, the ALJ does not refer to plaintiff's GAF score of 55 to explain why a score significantly below that of a mentally competent individual, albeit above someone who would be hospitalized, is not indicative of significant mental health impairments. Moreover, in addition to the four visits with Dr. Brewer in 2011 and early 2012 (see discussion supra beginning on page 14), the record also documents five psychotherapy appointments with licensed practitioners at the Emma L. Bowen Center (see discussion supra beginning on page 11). These psychotherapy records amplify and supplement the treatment context and opinions put forth by Dr. Brewer, but the ALJ does not mention them, let alone assign them a weighting.

While a licensed social worker is not considered an "acceptable medical source," the SSA will, under 20 C.F.R. §§ 404.1513(d), 416.913(d), use evidence from such sources "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." SSR 06-03. The evidence

from "other sources," such as the licensed social workers who
treated Ms. Castillo, cannot establish the existence of a medically
determinable impairment -- only an "an acceptable medical source"
such as Dr. Brewer could do that -- but they can provide insights,
"based on the special knowledge of the individual," that they have
acquired through their treatment. Id. Indeed, courts have reviewed
and remanded ALJ decisions for failing to consider the evidence
provided by "other sources." See Baron v. Astrue, 2013 WL 1245455,
*26 (S.D.N.Y. Mar. 4, 2013) report and recommendation adopted,
2013 WL 1364138 (S.D.N.Y. Mar. 26, 2013)(listing cases supporting
the court's power to find error when ALJs had not given appropriate
weight to social workers, nurse practitioners, and similar "other
source" evidence).

On remand, the Commissioner should fully evaluate and weigh
the psychotherapy evidence provided by LSCWs at the Emma L. Bowen
Center. See SSR 06-03 ("[M]edical sources who are not 'acceptable
medical sources,' such as . . . licensed clinical social workers,
have increasingly assumed a greater percentage of the treatment
and evaluation functions previously handled primarily by
physicians and psychologists. Opinions from these medical sources
. . . are important and should be evaluated on key issues such as
impairment severity and functional effects, along with the other

relevant evidence in the file.") The Commissioner should then reconsider her weighting of Dr. Brewer's diagnostic and opinion evidence in light of the psychotherapy treatments.

### C. The ALJ Erred in Evaluating Plaintiff's Credibility.

The SSA regulations require the ALJ to assess the claimant's credibility in a systematic way and to take seriously the claimant's report of subjective symptoms. 20 C.F.R. § 404.1529. In doing so, the ALJ exercises discretion over the weight assigned to a claimant's testimony regarding the severity of his pain and other subjectively perceived conditions, and his resulting limitations. See, e.g., Schultz, 2008 WL 728925 at *12 (citing Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979); Snell, 177 F.3d at 135). If the ALJ's findings are supported by substantial evidence, a reviewing court must uphold his decision to discount the claimant's testimony. See Marcus, 615 F.2d at 27 (citing Richardson, 402 U.S. at 401).

Nonetheless, the ALJ's discretion is not unbounded. The Second Circuit has held that throughout the five-step process, "'the subjective element of [plaintiff's] pain is an important factor to be considered in determining disability.'" Perez, 234 F. Supp. 2d 336, 340 (S.D.N.Y. 2002) (quoting Mimms v. Heckler, 750

F.2d 180, 185 (2d Cir. 1984)); see also 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3) ("We will . . . consider descriptions and observations of [a claimant's] limitations from [his or her] impairment(s), including limitations that result from [his or her] symptoms, such as pain, provided by [that claimant]"). In assessing the claimant's testimony, the ALJ must take all pertinent evidence into consideration. E.g., Perez, 234 F. Supp. 2d at 340-41; see also Snell, 177 F.3d at 135 (stating that an ALJ is in a better position to decide credibility than the Commissioner). Even if a claimant's account of subjective pain is unaccompanied by positive clinical findings or other objective medical evidence,[32] it may still serve as the basis for establishing disability as long as the impairment has a medically ascertainable source. See, e.g., Harris v. R.R. Ret. Bd., 948 F.2d 123 (2d Cir.

---

[32] Objective medical evidence is "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1529(c)(2); see also Casino-Ortiz, 2007 WL 2745704 at *11, n.21 (quoting 20 C.F.R. § 404.1529(c)(2)). Clinical diagnostic techniques include methods showing "residual motion, muscle spasms, sensory deficit or motor disruption." 20 C.F.R. § 404.1529(c)(2). See also 20 C.F.R. § 404.1528(b). Laboratory findings "are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests." 20 C.F.R. § 404.1528(c).

1991) (citing Gallagher v. Schweiker, 697 F.2d 82, 84-85 (2d Cir. 1983)).

SSA regulations require the ALJ to consider "all of the available evidence" concerning a claimant's complaints of pain when they are accompanied by "medical signs and laboratory findings . . . which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence . . . , would lead to a conclusion that you are disabled." 20 C.F.R. §§ 404.1529(a), 416.929(a). An ALJ must apply a two-step process to evaluate a claimant's subjective description of his or her impairment and related symptoms. 20 C.F.R. §§ 404.1529, 416.929; see also SSR 96-7p, 1996 WL 374186, at *6-9 (July 2, 1996) (summarizing framework). "First, the ALJ must consider whether the claimant has a medically determinable impairment which could reasonably be expected to produce the... symptoms alleged by the claimant." Martinez, 2009 WL 2168732, at *16 (alteration in original) (citing McCarthy v. Astrue, 2007 WL 4444976, *8 (S.D.N.Y. Dec. 18, 2007)); see also 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). "Second, the ALJ must 'evaluate the intensity and persistence of those symptoms considering all of the available evidence.'" Peck v. Astrue, 2010 WL 3125950, *4 (E.D.N.Y. Aug. 6, 2010) (citing 20 C.F.R. § 404.1529(c)); accord Meadors v.

66

Astrue, 370 F. App'x 179, 183 (2d Cir. 2010) (citing 20 C.F.R. §
404.1529(c)(3)(i)-(vii)) and Taylor v. Barnhart, 83 F. App'x 347,
350-51 (2d Cir. 2003)). "To the extent that the claimant's 'pain
contentions are not substantiated by the objective medical
evidence,' the ALJ must evaluate the claimant's credibility."
Peck, 2010 WL 3125950, at *4 (citing 20 C.F.R. § 404.1529(c)); see
also Meadors, 370 F. App'x at 183-84 (citing 20 C.F.R. §
404.1529(c)(3)(i)-(vii); Taylor, 83 F. App'x at 350-51).

It should be noted that "the second stage of [the] analysis
may itself involve two parts." Sanchez v. Astrue, 2010 WL 101501,
*14 (S.D.N.Y. Jan. 12, 2010). "First, the ALJ must decide whether
objective evidence, on its own, substantiates the extent of the
alleged symptoms (as opposed to the question in the first step of
whether objective evidence establishes a condition that could
'reasonably be expected' to produce such symptoms)." Id. "Second,
if it does not, the ALJ must gauge a claimant's credibility
regarding the alleged symptoms by reference to the seven factors
listed [in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3)]." Id.
(citing Gittens v. Astrue, 2008 WL 2787723, *5 (S.D.N.Y. June 23,
2008)). If the ALJ does not follow these steps, remand is
appropriate. Id. at *15 (citing 20 C.F.R. § 404.1529(c)).

When a claimant reports symptoms more severe than medical evidence alone would suggest, SSA regulations require the reviewing ALJ to consider specific factors in determining the credibility of a claimant's symptoms and their limiting effects. SSR 96-7p, 1996 WL 374186, at *2. These seven factors include: (1) an individual's daily activities; (2) the location, duration, frequency and intensity of pain or other symptoms; (3) factors that precipitate and aggravate those symptoms; (4) the type, dosage, effectiveness, and side effects of medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual receives or has received for pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); see also Bush, 94 F.3d at 46 n.4; Wright v. Astrue, 2008 WL 620733, *3 (E.D.N.Y. Mar. 5, 2008) (citing SSR 96-7p).[33]

---

[33] SSR 96-7p states, in pertinent part, "in recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. sections 404.1529(c) and 416.929(c) describe the kinds of evidence, including the

Finally, "'[o]nly allegations beyond what is substantiated by medical evidence are to be subjected to a credibility analysis... [because requiring] plaintiff to fully substantiate [his] symptoms with medical evidence would be both in abrogation of the regulations and against their stated purpose." Martin v. Astrue, 2009 WL 2356118, *10 (S.D.N.Y. July 30, 2009) (citing Castillo v. Apfel, 1999 WL 147748, *7 (S.D.N.Y. Mar. 18, 1999)).

### 1. Plaintiff's Credibility Regarding her Arthritis Symptoms and Back Pain

Judged by these standards, we conclude that there are significant errors in the ALJ's review of the evidence. First, the ALJ incorrectly evaluated plaintiff's complaints of arthritis, stating that there "no documentation in any medical report to find that the claimant suffers from arthritis." However, in addition to plaintiff's own testimony that she had arthritis, Dr. Reyes's report, an x-ray, records from the Emma L. Bowen Community Service Center, and even the consultative physician's report all provide

---

factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements."

evidence of patient's osteoarthritis. (Tr. at 47, 53, 273-74, 262, 216).

When there is objective evidence of an impairment, as there is here for osteoarthritis, the ALJ's credibility determination is limited to the claims of symptoms in excess of the evidence alone. Here, the ALJ did not first acknowledge the medical evidence before determining that plaintiff wholly lacked credibility regarding her complaints related to the arthritis. On remand, the Commissioner should first evaluate the objective medical evidence of plaintiff's osteoarthritis and then make an appropriate determination regarding its impact on her RFC.

### 2. Plaintiff's Credibility Regarding Other Physical Pain

ALJ Solomon also identified a perceived inconsistency with the record in plaintiff's claim that five to six years of lower-back and joint pain made her incapable of performing medium to heavy work. (Tr. 20). The ALJ observed that plaintiff only quit her cleaning work due to pain in 2010, and there was no medical evidence to suggest that her lower-back or joint pain worsened around that time. (Id.). In other words, according to the ALJ, Ms. Castillo was able to do the work, despite the reported lower-back and joint pain, for several years prior to 2010, and there

70

was no change in that condition documented in 2010. Therefore, the
ALJ did not find credible plaintiff's claims regarding that
condition and its attendant pain.

We are concerned that the ALJ drew this conclusion without
having first considered the full record of objective medical
evidence. As discussed supra beginning on page 59, the ALJ erred
when he dismissed the diagnoses of plaintiff's treating physician
without having first sought the full records from Dr. Reyes. And
Dr. Reyes was the physician caring for plaintiff's physical
ailments. Without whatever objective medical evidence might be
included in Dr. Reyes's absent treatment records, there is no way
for the ALJ to have properly evaluated what might have changed to
plaintiff's symptoms around December of 2010. In addition, the
record need not demonstrate a dramatic downturn in plaintiff's
condition in that period of time. Plaintiff may simply have been
unable to continue to perform heavy exertional work as a result of
years of pain and the normal process of aging. The ALJ simply never
considered this possibility.

On remand, the Commissioner should reconsider plaintiff's
credibility regarding her complaints of physical pain in light of
any supplemental evidence acquired from her treating physicians.

71

### 3. **Plaintiff's Credibility Regarding her Mental Impairments**

The ALJ noted three distinct aspects of the record and plaintiff's testimony that, in light of SSA regulations, supposedly undermined her credibility on mental health symptoms. First, the ALJ highlighted the evidence regarding plaintiff's claims that she experienced hallucinations, and noted that she reported hearing voices and seeing shadows to Dr. Brewer on December 6, 2011, but did not report such conditions to Dr. Fujiwaki at his evaluative appointment two weeks later. (Tr. 20).

It is not clear from Dr. Fujiwaki's report that he specifically asked about plaintiff's hallucinations. However, we note a logical flaw in the ALJ's discrediting of this symptom because it was not reported to the consulting psychologist. If plaintiff were fabricating this symptom to her treating psychologist, then presumably she would be not only capable of maintaining such a ruse before the SSA's own consulting expert, but motivated to do so by the prospect of financial gain.[34] In the

---

[34] The ALJ also appeared not to consider alternative explanations for the absence of a reference to hallucinations during Dr. Fujiwaki's examination such as, for example, simple embarrassment. In any event, he did not question plaintiff about this inconsistency, much less elicit a response from the treating doctors.

end, here, too, the ALJ's failure to seek out additional
clarifications from plaintiff's treating physicians undermines his
reasoning on plaintiff's credibility.

Second, the ALJ pointed out that plaintiff testified that she
experienced significant dizziness and sleepiness as side effects
to her medication; however, the treating psychiatry team
consistently checked the box that Ms. Castillo did not report any
side effects to her medications. (Tr. 21). Here, we agree with the
ALJ that it is reasonable to discount plaintiff's testimony
regarding her medication side effects. We note that while the ALJ
provided reasons to disregard plaintiff's complaints of dizziness,
he nonetheless factored in her dizziness in his RFC finding. (Tr.
21).

Third, the ALJ evaluated plaintiff's psychological
limitations of depression and dysphoria in light of her having
been able to travel to the Dominican Republic in December, 2011:
"[t]he fact that the claimant was able to travel to the Dominican
Republic for eight days without apparent incident is indicative of
significant psychological ability." (Tr. 21). To support this
conclusion, he pointed to evidence that her fears limited her to
taking buses rather than the subway trains, and that she

73

experienced some paranoia and nervousness in crowds. (Tr. at 17). However, he ignored the evidence that Ms. Castillo had a strong motivation to travel to the Dominican Republic despite her fears -- she was set to visit her son's grave for the first time -- and she was in the company of two of her daughters. Nonetheless, the ALJ does enjoy discretion in his credibility determinations, and it was not unreasonable for him to conclude that plaintiff's ability to travel abroad without incident limits the credibility of her testimony regarding her challenges with day-to-day travel at home.

### D. The ALJ Erred in Making the Vocational Determination

The occupational evidence provided by the vocational expert "generally should be consistent with the occupational information supplied by the [Dictionary of Occupational Titles ('DOT'), published by the Department of Labor]." SSR 00-4p. See also McAuliffe v. Barnhart, 571 F. Supp.2d 400, 407 (W.D.N.Y. 2008). If there is an "unresolved conflict between [vocational expert] evidence and the DOT, the [ALJ] must elicit a reasonable explanation for the conflict before relying on the [vocational expert] evidence to support a determination or decision about whether the claimant is disabled." Id.

First, we pause to note that the ALJ was correct to consult a vocational expert, because the Grids did not apply directly to this plaintiff. (Tr. 22). However, the ALJ first indicated that had the Grids applied, he would have applied rule 203.19. (Id.). Rule 203.19 applies to an individual closely approaching advanced age with "limited or less" education and "skilled or semi-skilled" work experience in which skills are not transferable. 20 C.F.R. Pt. 404, Subpt. P, App. 2. The record, however, indicates that Ms. Castillo had only unskilled work capacity. (Tr. 22). Moreover, the SSA regulations define a "limited education" as a 7th to 11th grade level of education, 20 C.F.R. §§ 404.1565(b), 416.964(b), whereas a "marginal education" is defined as having the reasoning abilities "needed to do simple, unskilled kinds of jobs. We generally consider that formal schooling at a 6th grade level or less is a marginal education." 20 C.F.R. §§ 404.1565(b)(2), 416.964(b)(2). Additionally the SSA takes into account an individual's inability to communicate in English when determining job capability. 20 C.F.R. §§ 404.1565(b)(5), 416.964(b)(5). Since the uncontroverted evidence indicates that plaintiff had at most a sixth-grade education and is considered illiterate, the ALJ mistakenly

determined plaintiff's educational level as limited, rather than either illiterate or marginal.[35]

Second, plaintiff argues that the vocational expert's analysis was flawed because the job codes that she cited require a higher degree of reasoning capacity than plaintiff possesses. (Pl. Mem. 21-26). We agree. The ALJ presented to the vocational expert the hypothetical that the plaintiff "has the ability to remember, understand, and carry out simple instructions, make simple work related decisions, maintain attention and concentration for two hour segments, could maintain a regular schedule with only occasional close interpersonal contact with others, and could work a job with only minimal production quotas." (Tr. 55). In response to these criteria, the vocational expert provided three jobs from the DOT; however, these three jobs do not all satisfy the criteria listed by the ALJ.

The DOT supplies a definitional trailer for each job code providing information on the Specific Vocational Preparation

---

[35] We note that the Grids do not provide special rules at the "medium" RFC for an individual whose educational level is illiterate, although that level is provided for in the rules for "light" and "sedentary" RFCs; otherwise, we would indicate that plaintiff's educational level should have been classified as illiterate.

("SVP"), General Education Development ("GED"), and Physical Demands required as a minimum for that job. 2 Dictionary of Occupational Titles 1009-14. In particular, the GED trailer "embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance." Id. at 1009. The GED contains three components -- reasoning, language, and math -- and the "Reasoning Development" component of the GED for a level 1 reasoning capacity specifies an individual who can "[a]pply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variable sin or from these situations encountered on the job." Id. at 1011. By contrast, a level 2 reasoning capacity requires an individual to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." Id. Moreover, the "Language Development" component for level 2 requires the ability to "[r]ead instructions for assembling model cars and airplanes" and to "[s]peak clearly and distinctly with appropriate pauses and emphasis, correct pronunciation, variations in work order, using present, perfect, and future tenses." Id.

77

Considering that plaintiff has only a marginal education, and is considered illiterate, and was found by the ALJ to have the capacity to carry out only simple instructions, it appears that plaintiff would be unable to perform any occupation requiring more than a level 1 GED in either reasoning or language development. Here, the vocational expert specified only one job code -- general helper in food preparation -- requiring a reasoning and language level of 1, while the other two codes required higher reasoning levels, and one also required higher language development.[36] While this particular issue was not raised at the hearing, there is clearly an inconsistency between the vocational expert's testimony, the information found in the DOT, and the ALJ's hypothetical. However, the ALJ did not provide any reasonable explanation for how he resolved this conflict.

On remand, should the Commissioner determine after reevaluating the medical evidence that plaintiff has an RFC that may be compatible with some work available in the economy, the Commissioner should then apply the "marginal education" definition

---

[36] 522.686-014, General Helper (food prep), features a GED of R1 M1 L1. 1 Dictionary of Occupational Titles 356. 319.677-014, Food-Service Worker, Hospital, features a GED of R3 M2 L2. Id. at 247. 920.587-018, Packager, Hand, features a GED of R2 M1 L1. 2 Dictionary of Occupational Titles 932.

to plaintiff and acquire revised vocational evidence from which she can make a step-five determination. At her step-five determination, the Commissioner should ensure that her decision comports with the DOT, and she should provide a reasonable explanation for any departures from, or conflicts within, the vocational evidence.

## CONCLUSION

The ALJ failed in several significant ways to fulfill his obligation to evaluate the record and support his findings with substantial evidence. Specifically, he failed to supplement the record in the face of notable lacunae and inconsistencies. He also improperly applied the treating-physician rule and failed to evaluate plaintiff's credibility in accordance with established methods. Additionally, the vocational evaluation does not comport with regulatory requirements and overstated plaintiff's educational and skills levels.

Accordingly, we conclude that remand is necessary to determine, in accordance with SSA regulations and case law, whether plaintiff qualifies for disability benefits. On remand, the

Commissioner should develop the record and reconsider the totality of the record as discussed above.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Analisa Torres, Room 2210, 500 Pearl Street, New York, New York, 10007, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(d).

DATED: New York, New York
       December 16, 2014


                              RESPECTFULLY SUBMITTED,


                              _____
                              MICHAEL H. DOLINGER
                              UNITED STATES MAGISTRATE JUDGE




        Copies of the foregoing Report and Recommendation have been
sent this date to:

        Joseph A. Pantoja, Esq.
        Assistant U.S. Attorney, S.D.N.Y.
        86 Chambers Street, 3rd Floor
        New York, New York 10007

        Richard P. Morris, Esq.
        Klein, Wagner & Morris, L.L.P>
        227 Broadway, 9th Floor
        New York, New York 10007